## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

LEWIS D. BAKER, Derivatively on )
Behalf of Nominal Defendant )
CHARGEPOINT HOLDINGS, INC., )
           )
       Plaintiff, )
           )
   v. )  Case No. _____
           )
PASQUALE ROMANO, RICK )
WILMER, ROXANNE BOWMAN, )
ELAINE L. CHAO, BRUCE CHIZEN, )  **JURY TRIAL DEMANDED**
AXEL HARRIES, JEFFREY HARRIS, )
SUSAN HEYSTEE, MARK )
LESCHLY, MICHAEL LINSE, EKTA )
SINGH-BUSHELL, and G. RICHARD )
WAGONER, JR., )
           )
       Defendants, )
           )
   and )
           )
CHARGEPOINT HOLDINGS, INC.,

     Nominal Defendant.

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Lewis D. Baker ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant ChargePoint Holdings, Inc. ("ChargePoint" or the "Company"), against certain of the Company's executive officers and its Board of Directors (the "Board") for breaches of fiduciary duties and violations of federal law by the

Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of an amended class action complaint filed in the securities class action captioned *Khan v. ChargePoint Holdings, Inc. et al,* Docket No. 5:23-cv-06172-PCP (N.D. Cal. 2023) (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by ChargePoint, legal filings, and news reports, and securities analysts' reports about the Company.

## <u>NATURE OF THE ACTION</u>

1.      This shareholder derivative action is brought on behalf of ChargePoint against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least June 1, 2023 and November 16, 2023, inclusive (the "Relevant Period") and for violation of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the

Securities Class Action, as set forth below.

2.     ChargePoint, a Delaware corporation based in California, offers electric vehicle charging infrastructure. The Company provides hardware, software, and services for residential, commercial, and public charging stations.

3.     Throughout the Relevant Period, the Individual Defendants disseminated materially false and misleading statements, concealing from the public that: (i) ChargePoint was incurring higher component costs and experiencing supply overruns for its first generation DC charging products; (ii) the Company was likely to incur impairment charges; (iii) the Company would experience reduced profitability; and (iv) as a result of the foregoing, the Individual Defendants' positive statements regarding the Company's business, operations, and prospects lacked a reasonable basis.

4.     On September 6, 2023, after the market closed, ChargePoint reported its financial results for the second quarter of fiscal year 2024, including a "$28.0 million, or 19 percentage point, inventory impairment charge," resulting in a second quarter GAAP gross margin of 1%, down from 17% in the same quarter of the prior year. The Company explained that the "inventory impairment charge was taken to address legacy supply chain-related costs and supply overruns on a particular DC product."

5.     On this news, the price of ChargePoint's stock declined 11% in one

day, closing at $6.29 per share on September 7, 2023.

6.      On November 16, 2023, after the market closed, ChargePoint announced preliminary financial results for the third quarter of fiscal year 2024, including an "additional non-cash inventory impairment charge" of $42 million "related to product transitions and to better align inventory with current demand" that would result in a "GAAP gross margin of negative 23% to negative 21%." The Company further indicated that it would fail to meet its revenue expectations of $150 to $165 million, reporting instead a range of $108 million to $113 million. Further, the Company announced the replacement of its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), effective immediately.

7.      On this news, the price of ChargePoint's stock declined 35% in one day, closing at $2.02 per share on November 17, 2023.

8.      On November 29, 2023, the Securities Class Action was filed against the Company, its CEO, and its CFO, exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)).

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as ChargePoint is incorporated in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## **PARTIES**

### *Plaintiff*

14. Plaintiff is, and has been at all relevant times, a shareholder of ChargePoint.

### *Nominal Defendant*

15. Nominal Defendant ChargePoint is incorporated under the laws of the State of Delaware.

16.   The Company's principal executive offices are located at 240 East Hacienda Avenue, Campbell, California 95008.   ChargePoint's common stock trades on the NYSE under the ticker symbol "CHPT."

***Individual Defendants***

17.   Defendant Pasquale Romano ("Romano") served as President, CEO, and as a member of the Board from February 2011 until November 16, 2023. According to the Company's public filings, Defendant Romano received $58,679,085 in compensation from the Company during the fiscal year ended January 31, 2022. As of April 30, 2023, Defendant Romano beneficially owned 7,215,180 shares of ChargePoint common stock, worth $61,040,422, which constituted 2% of the Company's total outstanding common stock.[1]

18.   Defendant Rick Wilmer ("Wilmer") has served as President and CEO of the Company since November 16, 2023. Prior to that, between July 2022 and November 2023, Defendant Wilmer served as ChargePoint's Chief Operations Officer ("COO"). According to the Company's public filings, Defendant Wilmer received $8,773,492 in compensation from the Company during the fiscal year ended January 31, 2022.

19.   Defendant Roxanne Bowman ("Bowman") has served as a member of

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $8.46 per share closing price of ChargePoint's stock on May 1, 2023.

the Board since August 2019 and serves as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Butte received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022.

20.     Defendant Elaine L. Chao ("Chao") has served as a member of the Board since November 2021. According to the Company's public filings, Defendant Chao received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022.

21.     Defendant Bruce Chizen ("Chizen") has served as a member of the Board since December 2014 and serves as a member of the Nominating and Corporate Governance Committee and the Compensation and Organizational Development Committee. According to the Company's public filings, Defendant Chizen received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022.

22.     Defendant Axel Harries ("Harries") has served as a member of the Board since October 2016. According to the Company's public filings, Defendant Harries received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022.

23.     Defendant Jeffrey Harris ("Harris") has served as a member of the Board since December 2018 and serves as Chair of the Audit Committee. According

to the Company's public filings, Defendant Harris received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022.

24.     Defendant Susan Heystee ("Heystee") has served as a member of the Board since August 2019 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Heystee received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022.

25.     Defendant Mark Leschly ("Leschly") has served as a member of the Board since December 2009 and serves as a member of the Compensation and Organizational Development Committee and as Chair of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Leschly received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022.

26.     Defendant Michael Linse ("Linse") has served as a member of the Board since April 2012. According to the Company's public filings, Defendant Linse received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022. As of April 30, 2023, Defendant Linse beneficially owned 34,729,970 shares of ChargePoint common stock, worth $293,815,546 and constituting 9.5% of the Company's total outstanding common stock.

27.     Defendant Ekta Singh-Bushell ("Singh-Bushell") has served as a member of the Board since April 2022 and serves as a member of the Audit

Committee. According to the Company's public filings, Defendant Singh-Bushell received $455,052 in compensation from the Company during the fiscal year ended January 31, 2022.

28.     Defendant G. Richard Wagoner ("Wagoner") has served as a member of the Board since February 2017 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Wagoner received $202,349 in compensation from the Company during the fiscal year ended January 31, 2022.

29.     The defendants identified in paragraphs 17-28 above are collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     Because of their positions as officers and/or directors of ChargePoint, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed ChargePoint and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

31.     Therefore, the Individual Defendants were required to act in furtherance of the best interests of ChargePoint and its shareholders.

32.     Each director and officer of the Company owes to ChargePoint and its shareholders the fiduciary duty to exercise good faith and diligence in the

administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ChargePoint, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of ChargePoint, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements,

earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's accounting policies and practices and its internal controls over financial reporting and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

36.    To discharge their duties, the officers and directors of ChargePoint were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of ChargePoint were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to ChargePoint's own Code of Conduct;

(b)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)     Remain informed as to how ChargePoint conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of ChargePoint and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ChargePoint's operations would comply with all applicable laws and ChargePoint's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of

the subjects and duties set forth above; and

> (i)    When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

37.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ChargePoint.

38.    At all times relevant hereto, the Individual Defendants were the agents of each other and of ChargePoint and were at all times acting within the course and scope of such agency.

39.    Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## **CHARGEPOINT'S CODE OF CONDUCT**

40.    The purpose of ChargePoint's Code of Conduct is to:

- Promote honest and ethical conduct, including ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;
- Promote compliance with applicable governmental laws, rules and regulations;

- Promote the protection of Company assets, including corporate opportunities and confidential information;
- Promote fair dealing practices;
- Deter wrongdoing;
- Promote prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and
- Ensure accountability for adherence to the Code.

41.    The Code of Conduct applies to "all directors, officers, and employees of ChargePoint Holdings, Inc. and its subsidiaries," and violations of the Code of Conduct may result in "disciplinary action, up to and including immediate termination of employment."

42.    In a section titled "Compliance with Applicable Laws, Rules and Regulations," the Code of Conduct states, in relevant part: "Obeying the law is the foundation on which the Company's ethical standards are built. You must comply with applicable laws, rules and regulations."

43.    In a section titled "Honest and Ethical Conduct," the Code of Conduct states, in relevant part: "The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically."

44.    In a section titled "Public Disclosure of Information," the Code of Conduct states:

> The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.
>
> Each director, officer and employee who contributes in any way to the

preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

- Be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and
- Take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

45.    In a section titled "Record-Keeping," the Code of Conduct states, in relevant part:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions and to comply with the law. . . . All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls.

## CHARGEPOINT'S AUDIT COMMITTEE CHARTER

46.    ChargePoint's Audit Committee Charter states that the purpose of the Audit Committee is to assist the Board in its oversight of:

- The integrity of the Company's accounting and financial reporting processes and the audit of the Company's financial statements,
- The Company's compliance with legal and regulatory requirements,

- The qualifications, independence, and performance of the Company's independent registered public accounting firm (the "independent auditor"), and
- The performance of the Company's internal audit function and independent auditor and the assessment and management of risks associated with the Company's internal accounting and financial controls.

47.    In a section titled "Review Responsibilities," the Audit Committee

Charter tasks the Audit Committee with the following:

- **Internal Controls.** Review and discuss with management and the independent auditor the design, implementation and maintenance of the Company's internal controls, including the adequacy and effectiveness, significant deficiencies or material weaknesses in those controls reported by the independent auditor or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls. Review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.
- **Disclosure Controls and Procedures.** Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures. Review the attestations or reports by the independent auditors relating to disclosure controls and procedures.
  * * *
- **Review Required Reports.** Review and discuss with management and the independent auditor the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Forms 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial ChargePoint Holdings, Inc. | Audit Committee Charter 4 Condition and Results of Operations," and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K. Direct the independent auditors to review the annual and

16

quarterly reports using professional standards and procedures for conducting such reviews. Conduct a postaudit review of the financial statements and audit findings, including any suggestions for improvements provided to management by internal audit or the independent auditors, and management's response to such suggestions.

\* \* \*

- **Quarterly Earnings Review.** Review, in general, earnings press releases, and review and discuss with management and the independent auditors' policies with respect to earnings press releases and the type and presentation of information to be included therein (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts, and rating agencies.

48.     In a section titled "Legal and Regulatory Compliance," the Audit Committee Charter states:

**Compliance Oversight.** Review, with counsel, legal or regulatory matters that could have a material impact on the Company's financial statements. Oversee compliance with the requirements of the SEC for disclosure of auditor's services and Committee members, member qualifications and activities. Oversee matters relating to the Company's ongoing liquidity, including its internal and external sources of liquidity, and capital resources, including the Company's financing arrangements.

## SUBSTANTIVE ALLEGATIONS

*Background*

49.     ChargePoint provides electric vehicle charging infrastructure, operating a network of charging stations and a platform connecting charging station owners, drivers, and businesses.

*Materially False and Misleading Statements*

50.    On June 1, 2023, the first day of the Relevant Period, the Company issued a press release announcing its financial results for the first quarter of fiscal year 2024, which stated, in relevant part:

ChargePoint delivered strong results in the first quarter, growing at nearly 60% year-over-year. ***We focused on delivering our broad portfolio of charging solutions across North America and Europe, while continuing to improve gross margins, and managing operating expenses,"*** said Pasquale Romano, President and CEO of ChargePoint. "The positive first quarter results are a testament to the strength and diversity of our business. As the only charging network to operate across all verticals in North America and Europe, we believe we remain well positioned to take advantage of the inevitable long-term growth opportunity ahead.

**First Quarter Fiscal 2024 Financial Overview**

- **Revenue.** First quarter revenue was $130.0 million, up 59% from $81.6 million in the prior year's same quarter. Networked charging systems revenue for the first quarter was $98.3 million, up 65% from $59.6 million in the prior year's same quarter. Subscription revenue was $26.4 million, up 49% from $17.6 million in the prior year's same quarter.
- **Gross Margin.** ***First quarter GAAP gross margin was 23%, up from 15% in the prior year's same quarter.*** First quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, was 25%, up from 17% in the prior year's same quarter.
- **Net Income/Loss.** First quarter GAAP net loss was $79.4 million, down from $89.3 million in the prior year's same quarter. Non-GAAP pre-tax net loss in the first quarter, which primarily excludes $24.0 million in stock-based compensation expense, $3.0 million amortization expense from acquired intangible assets and other items, was $52.8 million as compared to $71.7 million in the prior year's same quarter. Non-GAAP Adjusted EBITDA Loss, which primarily excludes stock-based

compensation expense, depreciation expense and amortization expense of acquired intangible assets, was $48.9 million in the first quarter, as compared to $67.1 million in the prior year's same quarter.

\* \* \*

**Second Quarter of Fiscal 2024 Guidance**

***For the second fiscal quarter ending July 31, 2023, ChargePoint expects revenue of $148 million to $158 million. At the midpoint, this represents an anticipated increase of 41% over the prior year's same quarter.[2]***

51.    On August 8, 2023, ChargePoint filed its quarterly report for the fiscal period ended April 30, 2023 with the SEC on Form 10-Q (the "1Q2024 10-Q"), which stated, in pertinent part:

Gross profit increased during the three months ended April 30, 2023 compared to the three months ended April 30, 2022 primarily due to an increase in Networked Charging Systems sales that resulted from an increase in the number of Networked Charging Systems delivered and an increase in Subscriptions revenue.

Gross margin increased during the three months ended April 30, 2023 compared to the three months ended April 30, 2022 primarily due to efficiencies realized in managing cost of Networked Charging Systems.

\*      \*      \*

Disruptions in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers have resulted in additional costs and, to a lesser extent, component shortages, and have led to fluctuations in EV sales in markets around the world. Increased demand for personal electronics and trade restrictions that affect raw materials have contributed to a shortfall of semiconductor chips, which has caused additional supply challenges both within and outside of ChargePoint's industry. Ongoing supply chain challenges, component

---

[2] Unless indicated otherwise, all emphasis is added in this Complaint.

shortages and heightened logistics costs have adversely affected ChargePoint's gross margins in recent quarters and ChargePoint expects that gross margins may continue to be adversely affected by increased material costs and freight and logistic expenses in the future.

52.     The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) ChargePoint was incurring higher component costs and experiencing supply overruns for its first generation DC charging products; (ii) as a result, the Company was likely to incur impairment charges; (iii) as a result, the Company would experience reduced profitability; and (iv) as a result of the foregoing, the Individual Defendants' positive statements regarding the Company's business, operations, and prospects lacked a reasonable basis.

53.     The truth partially emerged on September 6, 2023 when the Company announced its financial results for the fiscal quarter ended July 31, 2023 in a press release which revealed a $28.0 million inventory impairment charge (the "September 6, 2023 Press Release"). The September 6, 2023 Press Release stated, in pertinent part:

> In the second quarter, ChargePoint delivered solid growth. Our revenue of $150 million represents a 39% year-over-year increase despite a hesitant economy," said Pasquale Romano, President and CEO of ChargePoint. "In the quarter we fortified our access to working capital with a $150 million revolving credit facility and $38 million raised via our "at-the-market" offering. ***We took an inventory impairment charge to address a significant supply-chain related issue, and we announced***

*an estimated $30 million in annualized operating expense savings from reorganizing the business for agility, efficiency and scale.* We remain committed to delivering on our goal of generating positive non-GAAP adjusted EBITDA by the end of calendar 2024.

**Second Quarter Fiscal 2024 Financial Overview**

- Revenue. Second quarter revenue was $150.5 million, up 39% from $108.3 million in the prior year's same quarter. Networked charging systems revenue for the second quarter was $114.6 million, up 36% from $84.1 million in the prior year's same quarter. Subscription revenue was $30.0 million, up 48% from $20.2 million in the prior year's same quarter.

- Gross Margin. *Second quarter GAAP gross margin was 1%, down from 17% in the prior year's same quarter, and non-GAAP gross margin was 3%, down from 19% in the prior year's same quarter, in both cases primarily due to a $28.0 million, or 19 percentage point, inventory impairment charge. This inventory impairment charge was taken to address legacy supply chain-related costs and supply overruns on a particular DC product*.

- Net Income/Loss. Second quarter GAAP net loss was $125.3 million, up from $92.7 million in the prior year's same quarter. Non-GAAP pre-tax net loss was $86.1 million as compared to $62.3 million in the prior year's same quarter, *both reflecting the $28.0 million inventory impairment charge*. *Non-GAAP Adjusted EBITDA Loss was $81.2 million also reflects this inventory impairment charge in the second quarter,* as compared to $56.2 million in the prior year's same quarter.

- Liquidity. As of July 31, 2023, cash on the balance sheet was $263.9 million, which includes $37.7 million of at-the-market share offering gross proceeds during the second quarter.

- Shares Outstanding. As of July 31, 2023, the Company had approximately 360 million shares of common stock outstanding.

54.   The September 6, 2023 Press Release further stated:

**Third Quarter, Fourth Quarter and Full Fiscal Year 2024 Guidance**

For the third fiscal quarter ending October 31, 2023, ChargePoint expects:

- ***Revenue of $150 million to $165 million. At the midpoint, this represents an anticipated increase of 26% as compared to the prior year.***
- ***Non-GAAP gross margin of 22 to 25%.***
- ***Non-GAAP operating expenses of $81 million to $84 million.***

For the fourth fiscal quarter ending January 31, 2024, ChargePoint expects non- GAAP operating expenses of $79 million to $82 million.

For the full fiscal year ending January 31, 2024, ChargePoint expects revenue of $605 million to $630 million. At the midpoint, this represents an anticipated increase of 32% as compared to the prior year.

55.    Also on September 6, 2023, during an earnings call, Rex S. Jackson, ChargePoint's then-CFO, stated:

> Turning to guidance. ***For the third quarter of fiscal 2023, we expect revenue to be $150 million to $165 million, up 26% year-on-year and up 5% sequentially at the midpoint.*** For the full fiscal year, we are guiding to $605 million to $630 million, up 32% year-on-year at the midpoint.
>
> Regarding gross margin, ***for the third quarter, we expect to be between 22% and 25% on a non-GAAP basis as we work through the inventory levels discussed earlier. With the inventory issue behind us and aggressive programs for improving our cost structure on supply and manufacturing, we would expect to resume continued improvement in gross margin next year***.

56.    On this news, the price of ChargePoint's stock declined 11% in one day, closing at $6.29 per share on September 7, 2023.

57.    On September 11, 2023, ChargePoint filed its quarterly report for the fiscal period ended July 31, 2023 with the SEC on Form 10-Q (the "2Q2024 10-Q"),

which stated, in pertinent part:

> *For the remainder of fiscal year 2024, ChargePoint expects revenue to grow in both Networked Charging Systems and subscriptions due to increased demand in EVs and the related charging infrastructure market*.

58.    With respect to inventory levels, the 2Q2024 10-Q stated:

> Inventory levels are analyzed periodically and written down to their net realizable value if they have become obsolete, have a cost basis in excess of expected net realizable value or are in excess of expected demand. *During the three months ended July 31, 2023, the Company recorded an impairment charge of $28.0 million, consisting of $15.0 million charge to write down the carrying value of certain inventory on hand, as well as $13.0 million charge for losses on non- cancelable purchase commitments for inventory to be received after July 31, 2023, to reduce the carrying value of certain DC fast charging products to their estimated net realizable value.* The inventory impairment charge is included in the cost of revenue - networked charging systems in the condensed consolidated statements of operations.

59.    The 2Q2024 10-Q misleadingly characterized inventory risks that had

already materialized as merely hypothetical:

> ChargePoint's revenue growth is directly tied to the number of passenger and commercial EVs sold, which it believes drives the demand for EV charging infrastructure. The market for EVs is still rapidly evolving and although demand for EVs has grown in recent years, there is no guarantee of such future demand.
>
> ***
>
> *ChargePoint depends on the timely supply of materials, services and related products to meet the demands of its customers, which depends in part on the timely delivery of materials and services from suppliers and contract manufacturers. Significant or sudden increases in demand for EV charging stations, as well as worldwide* demand for the raw materials and services that ChargePoint requires to manufacture and sell EV charging stations, including component parts, may result in a shortage of such materials or may cause shipment delays due to

transportation interruptions or capacity constraints. Such shortages or delays could adversely impact ChargePoint's suppliers' ability to meet ChargePoint's demand requirements.

60.    The disclosures identified in paragraphs 53-59, while partially corrective, were materially false and misleading because they continued to conceal that: (i) ChargePoint was incurring higher component costs and experiencing supply overruns for its first generation DC charging products; (ii) as a result, the Company was likely to incur impairment charges; (iii) as a result, the Company would experience reduced profitability; and (iv) as a result of the foregoing, the Individual Defendants' positive statements regarding the Company's business, operations, and prospects lacked a reasonable basis.

61.    On November 16, 2023, after the market closed, ChargePoint released preliminary financial results for the third quarter of fiscal year 2024, which revealed another $42 million inventory impairment charge. The Company disclosed:

> Our core markets of North America and Europe both came under pressure late in the third quarter, with ***revenue falling far short of expectations***. Overall macroeconomic conditions, along with fleet and commercial vehicle delivery delays impacted anticipated deployments with government, auto dealership and workplace customers." said Rick Wilmer, President and CEO of ChargePoint.

> \*      \*      \*

> Over the past 18 months in his prior role as Chief Operating Officer, Wilmer has completed a thorough analysis of ChargePoint's supply chain, manufacturing partnerships and inventory management approach. "The ChargePoint board and I are committed to significantly improving operational execution to ensure that the Company is building a stronger, more resilient business for the benefit of all stakeholders.

***Our first steps are to take an additional non-cash inventory impairment charge related to product transitions and to better align inventory with current demand.*** We remain committed to our goal of generating positive adjusted EBITDA in the fourth quarter of calendar 2024," said Wilmer.

**Preliminary Third Quarter Fiscal Year 2024 Financial Performance**

- ***Revenue of $108 to $113 million, as compared to $150 to $165 million as previously expected***.
- ChargePoint expects to take a ***non-cash impairment charge of $42 million resulting in GAAP gross margin of negative 23% to negative 21% and non- GAAP gross margin of negative 19% to negative 17%.***
- ***Pre-impairment non-GAAP gross margin of 19% to 21%, as compared to 22% to 25% as previously expected***.
- ChargePoint expects GAAP operating expenses of $129 million to $131 million. Non-GAAP operating expenses of $80 million to $82 million, as compared to $81 million to $84 million as previously expected.
- As of October 31, 2023, cash, cash equivalents and restricted cash was approximately $397 million, which includes $232 million of at-the-market share offering gross proceeds, as previously announced on October 11, 2023.
- As of October 31, 2023, ChargePoint's $150 million revolving credit facility remains undrawn, and the Company has no drawn debt maturities until 2028.

62.   Also on November 16, 2023, ChargePoint announced that it would be replacing its CFO as well as its President and CEO, Defendant Romano, effective immediately.

63.   On this news, the price of ChargePoint's stock declined 35% in one day, closing at $2.02 per share on November 17, 2023.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

65.    ChargePoint is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

66.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

67.    Plaintiff is an owner of ChargePoint stock and has been a continuous holder of the Company's common shares at all relevant times.

68.    At the time this action was commenced, the eleven-member Board was comprised of Defendants Wilmer, Bowman, Chao, Chizen, Harries, Harris, Heystee, Leschly, Linse, Singh-Bushell, and Wagoner. Accordingly, Plaintiff is only required to show that six Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this

action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

69.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

70.     The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

71.     As members of the Board charged with overseeing the Company's

affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of ChargePoint, the Individual Defendants knew, or should have known, the material facts surrounding ChargePoint's supply chain issues.

72.    Defendant Romano is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

73.    Defendants Harris, Heystee, Singh-Bushell, and Wagoner serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Harris, Heystee, Singh-Bushell, and Wagoner cannot independently

consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

74.     Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of ChargePoint stock and stock options they held.

75.     The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to ChargePoint's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

76.     Furthermore, demand in this case is excused because each of the

directors derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Individual Defendants have taken remedial action to redress the conduct alleged herein.

77.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

78.     The acts complained of herein constitute violations of fiduciary duties owed by ChargePoint's officers directors, and these acts are incapable of ratification.

79.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to

purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of ChargePoint. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of ChargePoint, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

80.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause ChargePoint to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

81.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I
**Against the Individual Defendants for
Breach of Fiduciary Duties**

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     The Individual Defendants, by virtue of their positions and roles in ChargePoint, are fiduciaries of the Company who owe ChargePoint the highest obligations of good faith, fair dealing, loyalty, and due care.

84.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

85.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to ensure the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

87.    Plaintiff, on behalf of ChargePoint, has no adequate remedy at law.

**COUNT II**
**Against the Individual Defendants for**
**Unjust Enrichment**

88.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ChargePoint.

90.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from ChargePoint that was tied to their performance or to the artificially inflated valuation of ChargePoint.

91.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court

disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

92.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

93.    Plaintiff, on behalf of ChargePoint, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act and Rule 10b-5

94.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

96.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.    The Individual Defendants violated Section 10(b), of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff.

98.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of ChargePoint were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

99.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of ChargePoint, their control over, and/or receipt and/or modification of the materially misleading statements alleged herein, and/or their associations with the Company which made them privy to confidential proprietary information concerning ChargePoint, participated in the fraudulent scheme alleged herein.

100.    As a result of the foregoing, the market price of ChargePoint common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of ChargePoint common stock in purchasing

ChargePoint common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

101.   In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT IV
### Against the Individual Defendants for Waste of Corporate Assets

102.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.   The Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

104.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

105.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

106.    Plaintiff on behalf ChargePoint has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January  4, 2024

**RIGRODSKY LAW, P.A.**

Of Counsel:

By: */s/ Herbert W. Mondros*

Herbert W. Mondros (#3308)

**GRABAR LAW OFFICE**

Seth D. Rigrodsky (#3147)

Joshua H. Grabar

Gina M. Serra (#5387)

One Liberty Place

300 Delaware Avenue, Suite 210

1650 Market Street

Wilmington, DE 19801

Suite 3600

Telephone: (302) 295-5310

Philadelphia, PA 19103

Facsimile: (302) 654-7530

Telephone:  (267) 507-6085

Email: sdr@rl-legal.com

Email: jgrabar@grabarlaw.com

Email: gms@rl-legal.com

Email: hwm@rl-legal.com

*Attorneys for Plaintiff*